Joseph and Bula R. Carmack v. Commissioner.
Joseph v. Commissioner
Docket No. 18484.
United States Tax Court
1949 Tax Ct. Memo LEXIS 155; 8 T.C.M. (CCH) 582; T.C.M. (RIA) 49149; June 15, 1949
*155 Muckleroy McDonnold, Esq., 1420 Transit Tower, San Antonio, Tex., for the petitioners. D. Louis Bergeron, Esq., and Francis S. Gettle, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: The Commissioner determined a deficiency of $19,482.10 in petitioner's income tax for 1945 and added 5 per cent for their negligence to report all income received. Petitioners admit receipt of unreported poker winnings and some interest, but in an amount substantially less than that determined. They contest imposition of the penalty. Findings of Fact Petitioners, husband and wife, are residents of San Antonio, Texas, and filed a joint income tax return for 1945 with the collector of internal revenue for the first district of Texas. On this return they reported a gross income of $4,144.96, consisting entirely of the husband's compensation for services as a colonel in the United States Army. They reported a gross income of $3,574.92 for 1944, and filed returns for preceding years to 1940, showing little or no tax due. They filed no returns for the years 1931-1939. The husband (hereafter called petitioner) joined the army as a private in 1923; *156 became a second lieutenant in the Reserve Corps in 1927 and in the regular army in 1930. He was then stationed in the Philippine Islands where he met his present wife, and they were married at Manila in July 1931. She had been an army nurse since 1928. After marriage she left this service, but worked about a year in private nursing. Petitioner's salary and allowance as a second lieutenant were about $2,400 a year, and as an army nurse his wife had received about $110 a month. She got $10 a day for private nursing. At the time of her marriage she had several hundred dollars in a Manila bank account, and thereafter petitioner sometimes gave her money which he had won at poker playing in addition to a $100 monthly allowance. In 1936 petitioner was promoted to the grade of first lieutenant with annual salary and allowances of about $3,600. He was transferred successively to Denver, Colorado; Carlisle, Pennsylvania; Honolulu, T.H., and in 1939 to Fort Sam Houston at San Antonio, Texas. In that year he was promoted to the grade of captain with annual salary and allowances of $5,584; was attached to the medical branch of the army, and placed in charge of hospital supplies and utilities. *157 He purchased a home in San Antonio in 1939 for $6,100, giving a note for most of the price, which note was payable in monthly installments of $40. He also opened an account with the Fort Sam Houston National Bank of San Antonio in the joint names of himself and his wife. During and after 1940 petitioner was absent from Fort Sam Houston much of the time, engaging in organizing hospital facilities or in field maneuvers. Then for the first time he allotted a portion of his salary for direct payment to his wife. He was promoted to major in 1942, and in July of that year was ordered to Battle Creek, Michigan, where he served a year as officer in charge of army hospital supplies. His wife and two sons, who were born in 1934 and 1935, respectively, accompanied him to that post. He opened there a joint account with the Michigan National Bank. In July 1943 he was sent to the Mediterranean theater of operations, serving in Algiers and Italy as administrative officer with the Medical Department. He returned to the United States in November 1945. During his absence overseas his wife resided at the home in San Antonio. In 1944 she paid off the $5,400 still due on the home mortgage note, and she *158 also purchased six $1,000 Series E War Bonds for $4,500 through the Fort Sam Houston Bank. Petitioner was promoted to the grade of lieutenant colonel in 1943 and colonel in 1945. Prior to 1945 he had directed that each month $175 of his salary be paid to his wife; that $150 be deposited in their joint account with the Michigan National Bank; that $18.75 be credited to the purchase of Series E War Bonds, and that $52.50 be deducted for insurance. During 1945 he received as salary and allowances $7,588.96, of which $253 a month, or about $3,000, was paid directly to him. On January 1, 1945, petitioner and his wife held Series E War Bonds of a maturity value of $6,950, which had cost $5,212.50, and credit balances in their joint accounts with the Fort Sam Houston and Michigan National Banks were $447.88 and $896.34, respectively. On April 5, 1945, the bond office of the War Department procured the issuance to petitioner or wife of two $1,000 Series E War Bonds, costing $1,500, and on September 14 a $1,000 Series E War Bond, costing $750, was issued to them through the Fort Sam Houston Bank, bringing their total holdings of these bonds to over $10,000 maturity value. On September 7 *159 the wife invested $2,500 in Postal Savings bonds, withdrawing that amount from the Fort Sam Houston Bank account. On September 28 she cashed eight $1,000 Series E Bonds, receiving about $6,000 therefor, and used a part of the proceeds to purchase a $5,000 cashier's check which she sent to petitioner. In October she purchased and sent him another $5,000 cashier's check, paying for it with the proceeds of the $2,500 Postal Savings bonds, of twenty-three $25 Series E Bonds, which she cashed in; a withdrawal of $1,559.01 from the Fort Sam Houston Bank account and $500 additional. Petitioner wished the money to use for poker stakes. The two $5,000 cashier's checks, which were not negotiable, were presented for payment at Vatican City on February 7, 1946. In October there were issued to petitioner or his wife through the bond officer of the War Department eight $1,000 Series E War Bonds, costing $6,000, and in addition petitioner transmitted to his wife a money order for $14,500. Prior to leaving for the United States and on November 11, he procured from the Army Finance Officer for cash a money order for $10,000, which he cashed in Newport News, Virginia. On December 12 eight $1,000 Series *160 E War Bonds were issued to petitioner or wife through the Fort Sam Houston Bank at a cost of $6,000. On December 28 petitioner's wife invested $5,000 in Postal Savings bonds, and on December 31 petitioner purchased three $5,000 cashier's checks. During 1945 an aggregate of $15,075.85 was deposited in the joint account with the Fort Sam Houston Bank and $8,407.12 was withdrawn, leaving a credit balance of $7,116.61, or $6,668.81 in excess of the balance on January 1. The larger items of deposit included $875 on June 21, $2,000 on July 31, $1,000 on September 28, $5,000 on October 10, $1,500 on November 28, and $1,705.85 on December 5. The large items among numerous withdrawals consist of the $2,500 used to buy Postal Savings bonds on September 7, and $1,559.01 used for the remittance to petitioner on October 2. During 1945 an aggregate of $8,300 was deposited in the joint account with the Michigan National Bank and $7,097.94 was withdrawn, leaving a credit balance of $2,098.40, or $1,202.06 in excess of the balance on January 1. The items consisted of eleven $150 monthly deposits and $6,500 deposited on November 11. The principal withdrawals were $1,750 on September 14; $500 on October *161 2, and $5,000 on November 11. In summary petitioner and his wife held the following amounts in bank accounts, Series E War Bonds, Postal Savings bonds, and cashier's checks at the beginning and at the end of 1945: Bank
Series E
Postal
Cashier's
Accounts
Bonds
Savings
Checks
Total
December 31
$9,215.01
$13,087.50
$5,000
$15,000
$42,302.51
January 1
1,344.22
5,212.50
6,556.72
Increase
$7,870.79
$7,875.00
$5,000
$15,000
$35,745.79
After petitioner's return from Italy he and his wife began negotiations for the purchase of an apartment house. On January 14, 1946, she bought one located in San Antonio for $30,000, taking title to it as her separate property. To make payment, petitioner cashed nine $1,000 Series E bonds, the $5,000 Postal Savings bonds, used the three $5,000 cashier's checks and gave a check for the remainder. Later in 1946 petitioner bought a hotel for $50,000, borrowed $20,000 by mortgage on the apartment house and $25,000 from a colonel with whom he had been associated in poker games and had some accounts to settle. He later sold the hotel to the colonel for $65,000. Petitioner was retired as a colonel at *162 the end of 1946. In June 1947 the joint income tax return of petitioner and his wife for 1945 was assigned to a revenue agent for investigation after the Intelligence Unit of Treasury had reported remittances of $2,000 in July and $14,500 in October 1945 by him to his wife. Petitioner furnished the agent with bank statements but no cancelled checks or other documentary evidence. He admitted gains at poker, but claimed that he did not know they were taxable income. He never kept regular records. On October 8, 1947, he tendered to the collector an amended joint return for 1945, on which $6,500, described as "Estimated poker winnings above losses," was added to the salary of $4,144.96 originally reported. The amended return was not accepted by the collector, and petitioner's payment of additional tax was entered in a suspense account. Petitioner had no income apart from his salary, poker winnings and bond interest. The bond interest in 1945 was $49.74. On March 26, 1948, the Commissioner notified petitioner and his wife of a deficiency in 1945 tax based on a determined gross income of $45,389.54. On May 17, 1948, petitioner and his wife filed a petition with this Court, contesting *163 the determination, and consulted an accountant who gave instructions on how to prepare double entry records and set up the headings. Petitioner himself then prepared a detailed record, purporting to show his receipts and disbursements for 1945 from such receipts, vouchers and notations as could be found or obtained, and had the accountant look it over for form. This statement shows cash of $25,031.25 on January 1 in addition to bank accounts and bonds. Living expenses aggregating $3,366.05 are listed; poker winning of $23,300 and off-setting losses of $18,581.25, leaving an ostensible net gain of $4,718.75. The gross income of petitioner and his wife for 1945 was $38,465.49. Petitioner was negligent in failing to report all income received by him in that year. In determining a deficiency of $19,482.10 in tax for 1945, the Commissioner computed gross income as follows: Michigan National Bank Dec. 31
$ 7,098.40
Fort Sam Houston Bank Dec. 31
7,116.61
$14,215.01
On deposit Jan. 1
-1,344.22
$12,870.79
$12,870.79
Cashier's checks
15,000.00
Less amount deposited
1,000.00
Less bonds purchased
806.25
$13,193.75
13,193.75
Two money orders
5,000.00
Bonds purchased
14,325.00
$45,389.54
*164 The Commissioner also determined petitioner and wife liable for a 5 per cent negligence penalty of $974.11. Opinion Admitting receipt of $4,718.74 poker winnings and $49.74 interest not reported on the original return for 1945, petitioner attacks respondent's determination of a greater amount of unreported income, asking acceptance of the statement prepared by him. This statement indicates $8,913.45 as total income for the year, consisting of salary and the two unreported items. Although he testified generally that his statement was based on vouchers, records, and other documents, he introduced none of them in evidence, not even cancelled checks or bank statements. He kept no regular records, explaining that "in keeping with the way all the rest of the Americans do that are not professional gamblers, I just didn't keep books." His wife explained that she compiled data in the middle of 1948 from "old records in shoe boxes and everything else", but no longer had the old records, although she was not sure "that they are all destroyed." Petitioner's case, therefore, rests almost entirely on oral testimony and computations based on records not in evidence. Since he estimated his poker *165 winnings at $6,500 in 1947, and now computes them to be $4,718.75, it would seem that he lacks assurance himself. He testified that any item which he "couldn't definitely identify"as a poker loss, he showed as household expense, and displayed uncertainty as to some specific entries in the statement about which he was questioned. The conditions of military service which petitioner was performing during most of 1945 invite some relaxation in the degree of proof normally required for the explanation of unreported receipts. But we can not ignore a difference of $35,745.79 between the bank deposits and bonds (aggregating $6,556.72), held on January 1, and the deposits, bonds and cashier's checks (aggregating $42,302.51), held on December 31. Such an increase in the wealth of one who admits an income of only $8,913.45 requires a satisfactory and well supported explanation. So recognizing, petitioner and his wife testified that they had on January 1, $25,000.00 in large bills, and drew on these funds for purchasing bonds, drafts and cashier's checks. Although they reported no taxable income prior to 1940 and lived on an army salary, petitioner asserts that with poker winnings he made *166 to his wife presents which aggregated $33,100 by 1943 and which began with a gift of $7,000 in Manila. His wife testified that at marriage "I had $3,000 cash," but on cross examination supposed that she "had several hundred dollars." Although petitioner and she maintained bank accounts in Manila and at subsequent posts, she claims to have kept the accumulation of $1,000, $100 and $50 bills at home in a cedar chest, and carried it with her on changing residence. Petitioner added that he too kept large amounts of currency, at times $20,000, in a dresser drawer in his unlocked room overseas. In L. C. Olinger, 10 T.C. 423, we found that a wife of Indian descent, who had received oil royalties for years, had contributed $6,000 to the purchase of her husband's business. She too testified that she had kept the money hoarded at home, and as the vendor of the business stated that the taxpayer had paid him for it in $20 bills, we accepted the wife's testimony although not without some doubt. But here the circumstances tend to refute rather than corroborate the alleged cash accumulation. While poker winnings theoretically have no limit, petitioner in speaking of the four years *167 preceding 1945 thought he "broke about even" although he kept no records. When he purchased a home in 1939, at least $5,400 of the $6,100 price was represented by a mortgage note. When his wife purchased $2,500 Postal Savings bonds in September 1945, she paid for them by check. When she later sent petitioner two $5,000 cashier's checks, she cashed bonds and withdrew $1,559.01 from the bank to procure them. On petitioner's return to the United States he made substantial investments. Neither petitioner's position nor the pattern which emerges from his established financial transactions are at all compatible with the domestic hoarding of thousands of dollars. No recipient testified that the wife had made any large payment in bills, and when asked where the money box was kept, she did not answer, saying that she had her "own personal reasons for not stating." We do not consider the petitioner's alleged possession of $25,031.25 on January 1, 1945, as adequately established. We are likewise unable to base a finding on petitioner's testimony that a part of his receipts constituted collections on debts of $3,300 owed to him by fellow army officers. He stated that a $1,500 deposit slip of *168 November 27, not put in evidence, reflected repayments by the officers; then acknowledged that six $50 checks covered by the slip had been returned unhonored and that $1,000 of the deposit was a Treasury check with which a colonel "could very easily" have paid him. "I don't recall exactly how he paid me." In an amended answer respondent prays for increases of $11,793.46 in tax deficiency and $589.67 in penalty on the ground that the record discloses a gross income of $56,794.30 instead of the $44,889.54 determined. To the items of salary and interest which petitioner admits, respondent would add $23,300, an amount described on petitioner's statement as gross poker winnings, $3,300 "unidentified deposits," $15,000 cashier's checks, $5,000 Postal Savings bonds and $6,000 War Bonds. Although the record, chiefly testimony, presents a complicated and confused series of financial transactions, making it necessary to rely on inferences and implications from evidence of varying credibility unsupported by adequate records, we have reached the conclusion after a careful scrutiny that even the gross income determined is excessive. Respondent found that on December 31, 1945, the credit balance *169 in the Michigan National Bank was $7,098.40; petitioner places it at $5,000 less, and as he indicates a last withdrawal of exactly $5,000, we shall accept his figure. We also accept his figure of $3,366.05 for living expenses which approximates the $253 a month of salary paid to him directly. But of his salary $1,650 was deposited for him in the Michigan National Bank. He testified that he allotted $18.75 a month for the purchase of Series E War Bonds, and while Treasury's record of his bond purchases does not indicate the acquisition of but four $25 bonds, costing $75, it shows that he acquired through the War Department one $1,000 bond in May for $750. We shall assume that all the payments of $825 were taken from his salary since heavy duties, he alleges, interfered with serious poker playing until after the surrender. Thus $2,475 of the increase in net worth should be attributed to salary, and should be deducted from the $35,745.79 total increase, leaving $33,270.79. Whether this amount was derived from poker winnings or other sources, petitioner has not overcome the determination that it was taxable income in 1945, and respondent has not proved the increase greater. We hold that *170 this figure should be added to the salary of $4,144.96 reported, and interest of $49.74 unreported, and accordingly have found that the joint gross income of petitioner and his wife for 1945 was $38,465.49. Cf. Hague Estate v. Commissioner (C.C.A., 2nd Cir.), 132 Fed. (2d) 775; certiorari denied, 318 U.S. 787; Louis Halle, 7 T.C. 245. In contesting application of the 5 per cent addition to the deficiency imposed by section 293 (a), Internal Revenue Code, for negligence in failing to report all income, petitioner argues that he did not know poker winnings had to be reported and thought that gains and losses would offset each other in the long run. Neither argument rebuts an inference of negligence, and we sustain imposition of the penalty. Decision will be entered under Rule 50.